IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

JODY GREENBERG,                                )

                                         )

        Plaintiff,                   )    TC-MD 190105N

                                         )

     v.                            )

                                         )

MULTNOMAH COUNTY ASSESSOR,    )

                                         )

        Defendant.          )    **DECISION**

Plaintiff appealed the 2018-19 exception value of property identified as Account R239180 (subject property). A telephone trial was held on December 18, 2019. Plaintiff appeared and testified on his own behalf. Reed Shumaker (Shumaker), the property manager for the subject property, also testified on behalf of Plaintiff. Scott Elliott and Scott Carver appeared on behalf of Defendant. James Lais (Lais), registered appraiser, testified on behalf of Defendant.

Plaintiff offered Exhibits 1 to 17. Defendant moved to exclude Plaintiff's Exhibits as untimely. (Def's mot at 3, Dec 18, 2019.) Under Tax Court Rule-Magistrate Division (TCR-MD) 12 C(1)(a), exhibits in this case must have been either postmarked by December 4, 2019, or physically received by December 9, 2019. Plaintiff's exhibits were postmarked on December 6, 2019, and marked received by Defendant on December 10, 2019. (*Id.* at 4.) In response, Plaintiff provided a USPS tracking report showing the exhibits were delivered to Defendant on December 7, 2019. (Ptf's Rebuttal Ex 19 at 6.) The tracking report notes that someone signed for the exhibits on that date. (*Id.*) December 7, 2019, was a Saturday and December 10, 2019, was a Tuesday. Defendant offered no explanation why exhibits delivered to its office over the weekend would have been opened on Tuesday rather than the first business day of Monday,

December 9, 2019. The court concluded that Defendant received Plaintiff's exhibits timely on December 9, 2019, and denied its motion.

Defendant also moved to exclude Plaintiff's Exhibits 10 and 17 because they were prepared by experts who were not available to testify concerning their content. For example, Plaintiff's Exhibit 10 was an excerpt from an appraisal report for the subject property as of December 2015 and Plaintiff offered the exhibit to prove the subject property's real market value at the time. The court excluded Plaintiff's Exhibits 10 and 17.

Plaintiff moved to exclude Defendant's Exhibits A to G as untimely under TCR-MD 12 C(1)(a). Defendant's Exhibits were postmarked on December 6, 2019, and received by Plaintiff on December 14, 2019, with an initial failed delivery attempt on December 10, 2019. (Ptf's Rebuttal Ex 19 at 1-4.) Defendant conceded that its exhibits were untimely, and the court excluded them on that basis. On Plaintiff's motion, the court also excluded witness testimony concerning the exhibits that were not admitted.

## I. STATEMENT OF FACTS

The subject property is a four-plex in Portland; each of the units has two bedrooms and one bathroom. Plaintiff purchased the subject property in December 2015 for $420,500 and performed work on Unit D in 2017.[1] (*See* Ptf's Ex 3 at 5.) Defendant determined the subject property's 2018-19 real market value was $752,090 and the Board of Property Tax Appeals (BOPTA) reduced that value to $690,000. (*See* Ptf's Exs 3-4.) Defendant also determined the subject property had 2018-19 exception real market value of $45,850, which BOPTA sustained. (*See id.*) Plaintiff accepts the 2018-19 real market value set by BOPTA, but disputes the 2018-

---

[1] Plaintiff performed additional work on other units in 2018, but that is beyond the January 1, 2018, assessment date and not at issue in this appeal. (*See* Ptf's Ex 5.)

19 exception value, maintaining that it should be reduced to $0 because the only work performed meeting the definition of "new improvements to property" qualified for the minor construction exception for improvements of less than $10,000. Plaintiff maintains that the additional work performed qualified as "general ongoing maintenance and repair" (GOMAR), rather than new improvements to property. (*See* Ptf's Ex 1 at 3.)

A.      *Work Performed on Subject Property Unit D*

Plaintiff testified that he worked on Unit D in 2017 but performed no work on the exterior of the subject property or the other units during that year. (*See* Ptf's Ex 1 at 6.) Plaintiff described the work done and provided pictures from before and after the work. (*Id.* at 8; Ex 15.) In the bathroom, he replaced old vinyl flooring with new vinyl flooring, replaced the vanity, and upgraded the counter to granite. (*See* Ex 15 at 1-2.) He cleaned the bathtub but did not replace it or the surrounding tile. In the bedroom, Plaintiff replaced the carpet, the closet door, the door, and the baseboards. (*Id.* at 3-6.) He also painted and added a new light fixture. (*Id.*) In the kitchen, Plaintiff replaced the old appliances (range, refrigerator, dishwasher), the cabinets, the outlet covers, and the light switch covers. (*Id.* at 7-8.) He upgraded the countertops to granite. (*See id.*) Plaintiff repaired general damage done by the prior tenants. (*Id.* at 11-12.) He updated the old aluminum windows to vinyl, but not until 2018.[2] (*Id.* at 10.) Plaintiff testified that he did not know the exact age of items replaced because he bought the subject property in 2015 but estimated that most items were at least 20 years old based on their appearance.

Plaintiff provided Department of Revenue guidelines regarding what qualifies as GOMAR, such as replacing worn out components with new components, including modern equivalents. (Ptf's Ex 1 at 10, Exs 6-7.) He noted that the measure of exception value for

---

[2] *See also* Ptf's Ex 1 at 9 (listing work performed in 2018 and 2019); *see also* Ptf's Ex 5 (receipts).

upgraded items is the difference between the value of the old item if replaced and the value of the upgraded item. (*See* Ptf's Ex 6.) Based on the administrative guidance, Plaintiff categorized the work he performed into GOMAR and new improvements, identifying the following as new improvements: four new can lights in living room; upgraded granite counters in kitchen and bathroom; and two new ceiling fans upgrading standard light fixtures. (Ptf's Ex 1 at 11-12.) Shumaker testified that the condition of Unit D before Plaintiff worked on it reflected typical wear and tear from years of tenants. He agreed that Plaintiff's GOMAR items were repairs.

Plaintiff testified that the work he performed on Unit D was part of "a plan of regularly scheduled maintenance," even though he did it all at one time. He testified that he sets funds aside for maintenance and has a policy of performing it in between tenants. Plaintiff testified that is standard practice in the rental industry. Shumaker testified that the work Plaintiff performed in Unit D is typical of the work Plaintiff does in all his units between tenants to receive maximum potential rent. He testified that almost every apartment has deferred maintenance and it is difficult, if not impossible, to repair while a tenant is occupying the apartment; those repairs must be made in between tenants to compete in the market.

B.      *Plaintiff's Approaches to Value*

Plaintiff testified that he considered the three approaches to value to determine the value of the new improvements. (*See* Ptf's Ex 1 at 13-14.) He found the sales comparison approach was almost impossible to use because few items were new. Using the cost approach, Plaintiff identified the actual cost of each item, finding the total work performed cost $23,723, but the total excluding GOMAR cost $3,328. (Ptf's Ex 12.) He testified that his cost approach estimate was conservative because it did not account for the difference between the replacement cost and the upgraded cost, but rather the total cost of new items.

For his income approach, Plaintiff used a "gross rent multiplier" method.[3] (*See* Ptf's Ex 1 at 18-19.) He used the BOPTA real market value of $690,000 and gross rents of $55,200 resulting in a GRM of 12.5 for the 2018-19 year. (*Id.*) He compared that with a GRM of 9.7 as of December 2015.[4] Plaintiff found the GRM comparison indicated an annual rent increase of about $300 due to the new improvements, supporting a value of $3,000 to $3,700. (*See id.*) Plaintiff and Shumaker[5] each testified that Unit D rented for $1,099 per month before the work was completed. (*See also* Ptf's Ex 11 (rent roll as of January 1, 2018, showing Units A through C were each leased for $1,099 per month with lease dates from 2013 (Unit A) and 2007 (Units B and C)). Shumaker testified that, after the work on Unit D was complete, he listed it for $1,390 but received no offers for two weeks. He then lowered the asking rent to $1,295 and received one application. Shumaker believes $1,295 per month was market rent as of September 2017. He opined that the new improvements contributed approximately $20 per month in rent.

C.     *Defendant's Approach to Value*

Lais testified that he inspected the subject property on July 3, 2019, and agreed with the scope and timing of the work described by Plaintiff. He testified that, using his expertise, he determined the subject property's value increased by $30,000 to $80,000 based on the work

---

[3] Defendant asserted that a "gross rent multiplier" uses monthly rent, whereas a "gross income multiplier" uses annual rental income, so Plaintiff performed a gross income multiplier. *See also* Dictionary of Real Estate Appraisal at 91 (5th ed 2010) (defining the "gross rent multiplier" as "[t]he relationship or ratio between the sale price or value of a residential property and its gross monthly rental income"); *but see* The Appraisal of Real Estate at 507 (14th ed 2013) ("A gross rent multiplier applies to rental income only and can be calculated on a monthly or annual basis, consistent with market practices.").

[4] Plaintiff revised his calculations at trial to use the sale price rather than the appraisal value. Shumaker testified that market rent in December 2015 was $450 per bedroom, so $900 per month for the subject property units. He did not provide any comparable rentals or other evidence to support his testimony.

[5] Plaintiff and Shumaker each have significant experience in the rental market. Plaintiff testified that he owns 11 other rental properties and has been investing in rental property for the past eight or nine years. Shumaker testified that he manages the subject property for Plaintiff along with 1,970 other units in Portland. He is responsible for setting the rent and leasing the units, so he is knowledgeable of the Portland rental market.

Plaintiff did in Unit D. Lais testified that he did not consider any of Plaintiff's work to be GOMAR; he determined it was all exception value because it was done all at once.

## II. ANALYSIS

The issue presented is the subject property's 2018-19 exception real market value, which yields an increase in its 2018-19 maximum assessed value beyond three percent.

As the party seeking affirmative relief, Plaintiff bears the burden of proof by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). Evidence that is inconclusive or unpersuasive fails to meet the burden of proof. *See Reed v. Dept. of Rev.*, 310 Or 260, 265 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

A.      *Maximum Assessed Value and Exception Value*

Article XI, section 11 of the Oregon Constitution, also known as Measure 50, was adopted by the voters in 1997. *AKS LLC v. Dept. of Rev.*, __ OTR __ (Apr 18, 2019) (Slip Op at 16-17). Before Measure 50 was adopted, property taxes were based on the property's real market value. *Id*. at 16. Measure 50 created the concept of maximum assessed value and taxed property on the lesser of real market value or maximum assessed value. *Id*.; *see also* Or Const, Art XI, § 11(1)(f). Maximum assessed value cannot increase more than three percent per year. Or Const, Art XI, § 11(1)(b). However, that three percent rule is subject to several exceptions, including for "new property or new improvements to property." Or Const Art XI, § 11(1)(c)(A); *see also* ORS 308.146(3)(a).[6]

---

[6] The court's references to the Oregon Revised Statutes (ORS) are to 2017.

"'New property or new improvements' means changes in the value of property as the result of * * * [n]ew construction, reconstruction, major additions, remodeling, renovation or rehabilitation of property[.]" ORS 308.149(6)(a)(A). Those terms are further defined by rule. "'Remodeling' means a type of renovation that changes the basic plan, form or style of the property." OAR 150-308-0130(1)(d). "'Renovation' means the process by which older structures or historic buildings are modernized, remodeled or restored." OAR 150-308-0130(1)(e). "'Rehabilitation' means to restore to a former condition without changing the basic plan, form or style of the structure." OAR 150-308-0130(1)(f).

"'New property or new improvements to property' does not include changes in the value of the property as the result of * * * [g]eneral ongoing maintenance and repair [GOMAR]; or * * * [m]inor construction." ORS 308.149(6)(b). GOMAR "means activity that

"(A) Preserves the condition of existing improvements without significantly changing design or materials and achieves an average useful life that is typical of the type and quality so the property continues to perform and function efficiently;

"(B) Does not create new structures, additions to existing real property improvements or replacement of real or personal property machinery and equipment;

"(C) Does not affect a sufficient portion of the improvements to qualify as new construction, reconstruction, major additions, remodeling, renovation or rehabilitation; and

"(D) For income producing properties is part of a regularly scheduled maintenance program."

OAR 150-308-0130(2)(a). "'Minor construction' means additions of real property improvements, the real market value of which does not exceed $10,000 in any assessment year or $25,000 for cumulative additions made over five assessment years." ORS 308.149(5). It "does not include general ongoing maintenance and repairs." OAR 150-308-0160(2).

To the extent new improvements to property exist, the value of the new improvements is

multiplied by the changed property ratio[7] and added to the existing maximum assessed value. *See* ORS 308.153(1). The value of new improvements is "the real market value" of the new improvements less the real market value of any retirements. ORS 308.153(2)(a).

B.      *Distinguishing New Improvements from GOMAR*

        1.      *Case law*

Several prior decisions and opinions from this court are helpful to understand the differences between GOMAR and rehabilitation, renovation, or remodeling, each of which qualifies for the "new improvements" exception to the maximum assessed value cap.

"In *Hoxie,* the court described the work done by the taxpayer as comprising five projects: a new entry; a new staircase; a new lobby; various changes involving wiring, plumbing, and the like; and the 'cleaning and painting of the exterior walls and windows.' The court counted the first four projects towards the taxpayer's [exception value] but excluded the cleaning and painting." *Magno v. Dept. of Rev.*, 19 OTR 51, 63-64 (2006) (citing *Hoxie v. Dept. of Rev.*, 15 OTR 322, 326 (2001).) The court in *Magno* distinguished *Hoxie*, finding that

> "taxpayer effectively rebuilt half of her home, created a large new addition, and significantly updated the rest of the home and the landscaping as well—all as part of one comprehensive project. Although the work undoubtedly could be broken down into several small steps, such an approach would not accurately reflect the nature of the work done on taxpayer's property, and would lead to a distorted conception of [exception value]. There was nothing minor or routine about taxpayer's remodel."

*Magno*, 19 OTR at 64.

*Strom* involved a house originally built in 1896 with an addition from the 1920s that was used for a rental property for many years resulting in a "deteriorated * * * condition and

---

[7] That is "the ratio of average maximum assessed value to average real market value of property located in the area in which the property is located that is within the same property class." Or Const, Art XI, § 11(1)(c); *see also* ORS 308.153(1)(b).

appearance." *Strom v. Dept. of Rev.*, 15 OTR 309, 310 (2001). The taxpayer worked on the property over two years in the late 1990s, performing "more extensive work than originally anticipated" due to "building codes and other circumstances." *Id.*

> "Taxpayer removed the outside siding, interior walls in the front portion of the house, roof, windows, doors, and kitchen cabinetry and replaced them with all new materials. The house was entirely rewired for electricity, replumbed for water, and insulation was installed throughout. Taxpayer was required to enlarge all the doorways as well as build a ramp and new porch in order to become ADA compliant. Taxpayer installed a new bathroom floor, toilet, sink, and reconditioned the tub. In addition to new kitchen cabinets, taxpayer installed a new sink, tile countertops, and flooring. Taxpayer also replaced the front concrete walk and installed a new driveway."

*Id.* The taxpayer argued that the work qualified as GOMAR, but the court concluded most was renovation and some "clearly qualifie[d] as remodeling." *Id.* at 313. The court explained that "[m]uch of the existing materials were removed, discarded, and replaced with new materials. Therefore, the court finds that the work performed is not general ongoing-maintenance repairs but work that constituted remodeling, renovation, and rehabilitation." *Id.*

In *Rankin*, the court considered work performed on a 1939-built home that had been used as a rental property for many years before the taxpayers' purchase in 2016. *Rankin v. Multnomah County Assessor*, TC-MD 180080G, 2019 WL 6836008 at 1 (Or Tax M Div Jul 22, 2019). The work performed included adding a second bathroom and remodeling the main-floor bathroom, living area, and kitchen.[8] *Id.* Considering both *Strom* and guidance from the Department of Revenue, the court concluded that the main-level work was properly added as exception value, either as remodeling or rehabilitation. *Id.* at *8-9. "Like the property in *Strom*,

---

[8] Specifically, the kitchen "received 'cherry hardwood cabinets, solid surface quartz countertops, custom tile backsplash, and stainless appliances,' as well as new flooring and a new sink. The main-floor bathroom likewise received a new vanity, new flooring, a new sink, and a new backsplash. The evidence does not show what work, if any, was done on the living area." *Id.* at 3-4 (citations omitted).

the subject had been a rental for many years * * *.  Under such circumstances, it is reasonable to suppose that its condition had deteriorated from that of an owner-occupied home," indeed the taxpayer acknowledged that it "suffered from deferred maintenance."  *Id.*

In *MacRitchie*, the taxpayers purchased a 1999-built house and worked on it in 2010. *MacRitchie v. Clackamas County Assessor*, TC-MD 150402D at 2, 2016 WL 1602691 (Or Tax M Div Apr 19, 2016).  The county conceded that painting, refinishing cabinet doors, and refinishing hardwood floors was GOMAR.  *Id.* at 7.  The court found that the remaining work performed in the kitchen and bathroom were improvements.  *Id.*  Those included extending an island and adding a display area, adding a second level of glass on the island to make a breakfast bar, changing granite surfaces, changing tile, replacing the bathtub, replacing a window, and moving the structural entrance to the bathroom.  *Id.*  The taxpayers conceded those items "were not in need of 'maintenance' but were changed based on personal preference."  *Id.*

In *Blatner*, the taxpayer bought a house that had previously been used as a rental and "suffered from serious deferred maintenance."  *Blatner v. Multnomah County Assessor*, TC-MD 080472C, 2009 WL 323483 at 1 (Or Tax M Div Feb 3,2009).  Taxpayer worked on the house over several years. *Id.*  The following work qualified as "new improvements," either as renovation or rehabilitation: the new gas furnace and the gas line for that furnace; an additional gas line to the kitchen for the gas stove; the addition of a garbage disposal and dishwasher; the removal of some cabinets to allow for the relocation of the refrigerator; new tile counters; and the new electrical outlet in the bathroom.  *Id.* at *6.  The remaining projects qualified as GOMAR: the removal of a bathtub; the plumbing repair; the replacement of a toilet and cracked sink; the installation of a larger kitchen sink; the refinished floors; and the painting of interior

and exterior walls. *Id.* at *1, 6. Due to a lack of value evidence, the court sustained the assessor's exception value. *Id.* at *6.

In *Sullivan*, the taxpayers purchased a 1916-built house that "was not well maintained" and, over several years, replaced the kitchen cabinets, windows, and out-of-code plumbing, and upgraded the electrical service. *Sullivan v. Multnomah County Assessor*, TC-MD 060240B at 1, 2007 WL 900756 (Or Tax M Div Mar 22, 2007). The county assessor determined that the kitchen had been remodeled. *Id.* at 2. The court was satisfied that the kitchen qualified as GOMAR or minor construction and the other work performed did not "meet the statutory thresholds." *Id.* at 4.

2.      *Administrative guidance*

As noted above, Plaintiff provided administrative guidance from the Department of Revenue concerning what qualifies as GOMAR rather than new improvements. (*See* Ptf's Ex 6.) It states in pertinent part: "GOMAR preserves the condition of the existing improvements. It allows improvements to achieve a useful life that is typical for the type and quality of the original improvements." (*Id.*) "GOMAR allows for the replacement of worn out components. A change to the modern equivalent of original materials for the same class of construction is allowed, such as the replacement of old aluminum frame windows with new vinyl windows that would be used in the same class of building today." (*Id.*) GOMAR does not include "the replacement of original materials with substitutes of a higher quality class or that increase the useful life of the property beyond what would otherwise be typical." (*Id.*) "For income producing properties, GOMAR must be part of a regularly scheduled maintenance program. This can include improvements that occur either on a frequent basis, or for which funds are set-aside in anticipation of infrequent maintenance activities." (*Id.*)

The administrative guidance identifies some examples that typically qualify as GOMAR including "[r]eplacing worn out kitchen floor covering, appliances, and counter tops in a house[;] and annually repainting the interiors, re-carpeting, and replacing countertops and lavatories in 20 percent of the rooms of a four-star hospitality property (hotel)." (Ptf's Ex 6.) By contrast, "[r]eplacing kitchen floor covering, appliances, counter tops, and cabinets in a 10-year-old-house" generally would not qualify as GOMAR because it is not "typical for most homes of this age" and "is more than just maintaining the property." (*Id.*) With the hotel example, doing those updates to *all* the units would qualify as a rehabilitation rather than GOMAR because "it impacts a substantial portion of the property[.]" (*Id.*)

3. *Plaintiff's arguments*

Plaintiff maintains that both repairs and improvements increase the value of property, but new improvements "create new value" beyond what originally existed, whereas repairs "restor[e] depreciated value." (Ptf's Ex 1 at 25-26.) Curing deferred maintenance is a type of GOMAR and this work can generally occur only during a vacancy between tenants. (*See id.* at 27.) He noted that "[n]ot all 'ongoing' maintenance is frequent," for instance a roof replacement is required every 25 years whereas painting occurs every few years. (*Id.* at 36.) Market value increases over time and those market increases are not exception value; repairs bring a property's real market value up to its potential. (*See* Ptf's Ex 1 at 43-46.)

Plaintiff acknowledges that rehabilitation is similar in concept to GOMAR. (*See* Ptf's Ex 1 at 49-50.) In Plaintiff's view, they differ in the "scale of work done relative to total building value" and "whether the valuation prior to the work reflected a 'debilitated' property." (*Id.* at 50.) Plaintiff extracted the "scale of work" principle from the GOMAR example of repairing 20 percent of the rooms in a hotel as compared with work impacting a "substantial portion" of the

property. (*Id.* at 51, citing Ex 6.) Plaintiff argues that the work he performed was 25 percent of the building based on number of units or 6 percent of the building value based on the cost of work compared with the 2017-18 improvements value.[9] (*Id.* at 55.) Plaintiff does not think the 2017-18 value reflected a "debilitated property." (*Id.*) He reasons that rehabilitation results in a maximum assessed value increase because a debilitated property valuation results in a reduction of the "tax basis" for that property. (*Id.* at 57.)

4. *Whether Plaintiff's work qualified as new improvements or GOMAR*

Upon consideration, the court agrees with Plaintiff's categorization of work performed on Unit D, finding the majority qualified as GOMAR. Except for the few upgrades Plaintiff noted, the work performed primarily involved replacing worn out items and making repairs. Pictures of Unit D taken before the work, along with Plaintiff's credible testimony, confirms that items such as the kitchen appliances were likely at least 20 years old and worn out. Pictures and invoices support Plaintiff's testimony that he replaced worn out items with similar items or modern equivalents that appear typical of the same class of construction. The court did not receive specific evidence on whether the work performed impacted the class of the subject property. However, the subject property was used as a rental property before the work was performed and continued to be used as a rental property afterwards, suggesting the class remained the same. That is in contrast with cases such as *Strom*, *Rankin*, and *Blatner*, where a house previously used as a rental property was improved for owner-occupancy. Plaintiff did not change the overall plan or design of the subject property, increase its size, or otherwise add new elements.

As noted in OAR 150-308-0130(2)(a)(C), work performed must "not affect a sufficient portion of the improvements to qualify as new construction, reconstruction, major additions,

---

[9] Plaintiff notes that the "existing improvements" are the entire four-plex. (Ptf's Ex 1 at 24.)

remodeling, renovation or rehabilitation[.]" Citing examples in the administrative guidance, Plaintiff noted that the work performed on Unit D represented 25 percent of the subject property based on number of units and six percent based on cost compared to value. The court agrees that the scope of Plaintiff's work was not so significant as to become rehabilitation or renovation.

Finally, for income-producing properties, GOMAR must occur as "part of a regularly scheduled maintenance program." OAR 150-308-0130(2)(a)(D). Plaintiff owns 11 other rental properties and has been investing in rental properties for the past eight or nine years. Plaintiff and Shumaker each testified credibly that Plaintiff regularly sets aside funds to perform repairs and maintenance in between tenants, as is typical in the industry. The court is persuaded that Plaintiff performed GOMAR as part of a regularly scheduled maintenance program.

C.    *Real Market Value of New Improvements*

Plaintiff conceded that the following work qualified as "new improvements": four new can lights in the living room; upgraded granite counters in the kitchen and bathroom; and two new ceiling fans upgrading standard light fixtures. As discussed above, the real market value of new improvements is multiplied by the changed property ratio with the resulting product added to the existing maximum assessed value. However, if the real market value does not exceed $10,000 in one year or $25,000 over five years, the new improvements qualify as "minor construction" and do not impact maximum assessed value.

"Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor,* TC–MD No 020869D, WL 21263620 at 2 (Or Tax M Div Mar 26, 2003). "Real market value" is "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax

year." ORS 308.205(1). The assessment date for the 2018-19 tax year was January 1, 2018. ORS 308.007; ORS 308.210.

Real market value "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2). The three approaches to value that must be considered are: (1) the cost approach; (2) the sales comparison approach; and (3) the income approach. OAR 150-308-0240(2)(a); *see also Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003). Although all three approaches must be considered, all three approaches may not be applicable in each case. *Id*.

Plaintiff presented evidence under the cost and income approaches to determine the real market value of those new improvements. He determined a value of $3,328 under the cost approach and a value in the range of $3,000 to $3,700 under the income approach. Plaintiff's cost estimate was supported with actual receipts and invoices. His income approach compared the subject property's value at the time of Plaintiff's purchase — December 2015 — with the January 1, 2018, assessment date, covering a two-year time span. It is unclear how Plaintiff accounted for market changes in his income approach. Additionally, Plaintiff used $900 per month as market rent even though the subject property units rented for $1,099 per month. He did not supply any comparable rental properties. The court places more weight on Plaintiff's cost approach, which is better supported than his income approach, and finds the 2018-19 real market value of the new improvements to be $3,500. That amount is less than $10,000, so the new improvements qualify as minor construction.

Defendant presented expert witness testimony that the new improvements increased the subject property's value by $30,000 to $80,000. For a few reasons, the court declines to give any weight to that testimony. First, Defendant did not timely submit an appraisal report or other

documentary evidence to support its expert's opinion of value.  Second, Defendant's expert based his opinion of value on work that the court determined to be GOMAR rather that new improvements; thus, the opinion is overstated.  Finally, the difference between the subject property's 2017-18 and 2018-19 tax roll real market values was only $28,130 – less than the $45,850 set by Defendant.[10]  (*See* Ptf's Ex 3.)  There is no presumption that a tax roll value is correct and it may be that the 2017-18 real market value was overstated.  In any event, the court has accepted Plaintiff's categorization of work performed into GOMAR and new improvements, as well as Plaintiff's valuation of the new improvements.

## III.  COSTS AND DISBURSEMENTS

Plaintiff filed a Statement for Costs and Disbursements on December 30, 2019, requesting an award of $616.  That amount is composed of the $265 filing fee, $51 in postage for exhibits, and $300 for his expert witness.  Plaintiff provided receipts to substantiate those costs.  Defendant filed its Objection on January 7, 2020, objecting to the postage costs because Plaintiff sent his exhibits "express" and Defendant "should not be responsible for the additional cost."  Defendant objected to the expert fees because TCR-MD 16 allows only a statutory witness fee of $30 under ORS 44.415.

Plaintiff is the prevailing party under TCR-MD 16.  The court, in its discretion, awards Plaintiff costs and disbursements in the amount of $321 for his filing fee, exhibit postage, and witness.[11]  Although Defendant objected to Plaintiff's use of express mail, the court finds the expense was "reasonable and necessary" within the meaning of TCR-MD 16 A.

---

[10] The 2017-18 real market value was $661,870 and the 2018-19 real market value was $690,000.  (*See* Ptf's Ex 3.)

[11] ORS 44.415(2) limits the statutory witness fee to $5 "in any proceeding where a public body is a party[.]"  A county is a public body.  ORS 44.415(3).

## IV.  CONCLUSION

Upon careful consideration, the court finds that the 2018-19 real market value of new improvements to the subject property was $3,500 and, therefore, qualified as minor construction. The subject property's 2018-19 exception value is $0.  The court awards Plaintiff costs and disbursements in the amount of $321.  Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is granted.  The 2018-19 exception value of property identified as Account R239180 was $0.

IT IS FURTHER DECIDED that Plaintiff is awarded costs and disbursements in the amount of $321.

Dated this ___ day of June 2020.

_____
ALLISON R. BOOMER
PRESIDING MAGISTRATE

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed.  TCR-MD 19 B.*

*This document was signed by Presiding Magistrate Allison R. Boomer and entered on June 12, 2020.*